FILED
2017 Oct-02  PM 02:51
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# WESTERN DIVISION

| | | |
|---|---|---|
| **RAYMOND J. LANDIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **v.** | ) | |
| | ) | _____ |
| **UNUM GROUP** | ) | |
| **CORPORATION f/k/a UNUM** | ) | |
| **PROVIDENT CORPORATION;** | ) | |
| **and UNUM LIFE INSURANCE** | ) | |
| **COMPANY OF AMERICA,** | | |
| | | |
| **Defendant.** | | |

## COMPLAINT

Plaintiff Raymond J. Landis ("Plaintiff") brings this action for violations of the Employee Retirement Income Security Act of 1974 committed by Unum Group Corporation, f/k/a UnumProvident Corporation and Unum Life Insurance Company of America (collectively "UnumProvident") relating to the provision of ERISA-governed disability benefits under a group insurance plan sponsored by Plaintiff's former employer. In support of the relief requested herein, Plaintiff alleges the following upon personal knowledge as to himself and as to all other

1

matters upon information and belief based upon, *inter alia*, the investigation made by and through her attorneys:

## INTRODUCTORY STATEMENT

1.     This is an action for legal and equitable relief seeking redress of violations of the Employee Retirement Income Security Act (hereinafter referred to as "ERISA").  This suit is brought pursuant to 29 U.S.C. § 1132(a), to secure disability benefits due to Plaintiff through the group insurance policy ("The Plan") through Advanced Manufacturing Systems, Inc., a small company Mr. Landis both owned and operated before he became disabled.

2.     The Plaintiff seeks any and all benefits to which he may be entitled should this Court determine he is "disabled" under the terms of the Plan. Such benefits include all other available long-term disability benefits; waiver of premium benefits under disability, life, accidental death and dismemberment or accident policies issued or administered by UnumProvident; and any other benefits available through The Plan, including those managed, administered or underwritten by UnumProvident.

3.     Plaintiff seeks benefits based on the conditions documented in his medical records and other information before UnumProvident. Plaintiff's disabling conditions arise from his development of Grade IV glioblastoma, a serious form of brain cancer diagnosed in 2015 and for which he underwent significant brain surgery.

4.     The impact of this cancer and treatments has precluded Mr. Landis from working fulltime in any capacity since October 5, 2015 and has also rendered him substantially unable to care for himself daily.

## JURISDICTION

5.     Jurisdiction is appropriate under 28 U.S.C. § 1331 in that 29 U.S.C. §1132(e) confers jurisdiction upon the district courts of the United States where, as here, Plaintiff's claims relate to an "employee welfare benefit plan" and/or an "employee pension plan" as those terms are defined within 29 U.S.C. § 1001, et. seq.  The Plan "may be found" within this district.

6.     Jurisdiction is further appropriate under 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and diversity of citizenship exists between the parties.

7.     Venue is appropriate in this District Court pursuant to 29 U.S.C. § 1132(e)(2), in that the employee welfare benefit plan at issue was at least partly administered in this District, the breaches of duty alleged herein occurred in this District, and the Defendant may be found or reside in this District and, pursuant to 28 U.S.C. § 1391(b), in that the cause of action arose in this District.

## **PARTIES**

8.     As of the filing of this Complaint, Plaintiff Raymond J. Landis is a resident citizen of Alabama and this District.

9.     Defendant Unum Group Corporation is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

10.     Defendant Unum Group Corporation is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

11.     One of Unum Group Corporation's designated agents for service of process is:

c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104

4

12.     Unum Group Corporation is an entity exercising authority or control respecting the management or disposition of The Plan assets or the personnel exercising said authority over The Plan assets.

13.     Unum Group Corporation is an entity providing services to The Plan at issue.

14.     Unum Group Corporation is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

15.     Defendant Unum Life Insurance Company of America is a foreign corporation that does business by agent or otherwise in all counties in Alabama.

16.     Unum Life Insurance Company of America is a "fiduciary" of The Plan as that term is defined by 29 U.S.C. § 1002(21).

17.     One of Unum Life Insurance Company of America's designated agents for service of process is:

> CT Corporation System
> 2 North Jackson Street, Suite 605
> Montgomery, Alabama 36104

18.     Unum Life Insurance Company of America is an entity exercising authority or control respecting the management or disposition

5

of The Plan assets or the personnel exercising said authority over The Plan assets.

19.    Unum Life Insurance Company of America is an entity providing services to The Plan at issue.

20.    Unum Life Insurance Company of America is an entity meeting ERISA's definition of a "party in interest" in this case as that term is defined by 29 U.S.C. § 1002(14).

21.    Unum Life Insurance Company of America contracted with or presently has a contract for services with Defendant Unum Group Corporation, where Unum Group Corporation performs administrative functions for the Plan.

22.    Unum Life Insurance Company of America relies on employees provided through Unum Group Corporation for administrative functions for the Plan at issue.

## THE PLAN

23.    Upon information and belief, The Plan at issue was funded, at least in part, by a long-term disability insurance policy sold by Unum Life Insurance Company of America, the company which also underwrote the policy.

24.    This long-term disability policy was purchased by Plaintiff's employer for the purpose of conferring a benefit upon Plaintiff and other employees.

25.    As a result, this policy qualifies as an employee welfare benefit plan as defined in 29 U.S.C. § 1002(1), and Plaintiff qualifies as a participant and/or beneficiary under The Plan as that term is used in 29 U.S.C. § 1132.

26.    Under the terms of The Plan providing for disability benefits, Plaintiff is "disabled" as defined by The Plan.

27.    On information and belief, although the Plan purports to confer discretion to Unum Life Insurance Company of America, the employees that administered Plaintiff's claim either were employed by a different entity or acted under the direction or control of Unum Group Corporation pursuant to a general services agreement, notwithstanding them having presented themselves to Plaintiff as employees of Unum Life Insurance Company of America.

## UNUMPROVIDENT'S LIABILITY

28.    Ray Landis, an engineer by training, was the lone shareholder and President of Advanced Manufacturing Systems, Inc. ("AMS") before

he had to stop working in October 2015 because of Grade IV glioblastoma that first revealed itself through seizures.

29.   As the owner and founder for AMS, Mr. Landis was the primary person responsible for bringing in, and seeing to completion, all business and projects for the company.

30.   Since his departure, gross revenues for the company have plummeted.

31.   Mr. Landis's claim with UnumProvident has an unusual path. His claim for his group disability benefit under the group policy issued by Unum Life Insurance Company of America was initially approved on December 29, 2015.

32.   This approval occurred at the same time Mr. Landis was approved for a separate disability benefit under an individual disability policy issued by Provident Life and Accident Insurance Company processed and administered by the same claims personnel.

33.   In fact, the two approvals were announced in the same decision letter.

34.   After Mr. Landis was approved for the benefit under the Unum Life Insurance Company of America group policy, however, AMS's

comptroller inquired about the amount of Mr. Landis's benefit given his pre-disability income.

35.   The claims handler responded that under the coverage Unum Life Insurance Company of America had in place for Mr. Landis, the benefit was based only on salary earnings, not business earnings.

36.   Thereafter, an offer was made to expand Mr. Landis's coverage accordingly if his K-1s could be provided.

37.   Enticed by the larger benefit, Mr. Landis did as asked.

38.   This proved disastrous for Mr. Landis, because it set in motion machinery within UnumProvident that has led to the filing of this action. Specifically, as soon as the coverage was switched, UnumProvident personnel conducted a new review and found that not only was Mr. Landis's claim due to be terminated, but that it was also in an overpayment status leaving Mr. Landis owing <u>UnumProvident</u> money.

39.   UnumProvident's position was based on what it contended was an expanded definition in the changed-out policy of what earnings were included not just for the policy's earnings baseline, but also its provisions relating to income earned while the claimant is disabled.

40.     Accordingly,   UnumProvident   claims   handler   Shannon Cartier's January 3, 2017 letter informed Mr. Landis his benefit was being terminated and his claim closed because it had been determined that Mr. Landis's "disability earnings" exceeded the amount permissible for him to remain eligible for that benefit.

41.     Ms. Cartier then informed Mr. Landis's benefit was closed effective retroactively to June 30, 2016.

42.     Despite   Mr.   Landis   having   initially   been   found   by UnumProvident to be entitled to payment (a finding upon which Mr. Landis relied), it was since decided within UnumProvident that those payments should not have been made.

43.     Accordingly, UnumProvident took the position that Mr. Landis – who has not worked for some time – is indebted to Unum Life Insurance Company of America (as the issuer of the actual benefit checks) in the amount of $20,794.67.

44.     UnumProvident's contention in its original denial was that passive profits earned through AMS after Mr. Landis had ceased working disqualified him from future benefits under the following provision:

During the first 24 months of disability payments, if your monthly disability earnings exceed 80% of your indexed monthly earnings, Unum will stop sending you payments and your claim will end.

45.    Mr. Landis appealed the adverse actions taken on against his benefit on June 5, 2017 through his attorneys.

46.    The  gist  of  the  appeal  for  Mr.  Landis  was  that UnumProvident's interpretation of the term governing income received while disabled is contrary to the policy's plain language and the reasonable  expectations  of  insureds  because  UnumProvident's interpretation adds terms that are not there.

47.    Mr. Landis argued spoecifically that UnumProvident's reason for terminating the claim and finding there to be an overpayment is unsupported by the Policy's plain terms; "disability earnings" invoked by the provision above have been exactly <u>zero</u> for Mr. Landis at all relelevant times.

48.    According to the Plan, "disability earnings" do not include just any sums of money – or even earnings – that a claimaint receives; rather, under the Plan's plain language, "disability earnings" are those earnings that a claimant received *while* **working** *while disabled*.  The following definition is clear in its linkage between earnings and actual work:

DISABILITY EARNINGS means the earnings which you receive while you are disabled and working, plus the earnings you could receive if you were working to your maximum capacity.

[Landis 0746.]

49. In issuing its patently erroneous determination, the UnumProvident claims team for this file conflated "disability earnings" with "monthly earnings," borrowing the "monthly earnings" inclusion of K-1 income and grafting it into "disability income" provisions, even though "monthly earnings" is a completely different term having a completely different use within the policy.

50. "Monthly earnings" is a term applicable only to those provisions in the policy that set the initial standard against which such disability earnings would be measured.

51. Those provisions begin with the definition of the term itself:

*WHAT ARE YOUR MONTHLY EARNINGS?*

Owners
"Monthly Earnings" means your average monthly income from your Employer just prior to your date of disability and is computed based on the sum of your Schedule K-1 and W-2 income averaged over the lesser of:

a. the 3 most recent tax years (36 months); or

b. the period that you have been an owner, if you have been an owner for less than 3 years.

Schedule K-1 income is derived from the line that refers to "ordinary income (loss) from trade or business activities" received from your Employer.

W-2 income is derived from the income box on your W-2 form that reflects "wages, tips and other compensation" received from your Employer. It is your total income before taxes. It is prior to any deductions made for pre-tax contributions to a qualified deferred compensation plan.

It does not include income received from car, housing or moving allowances, Employer contributions to a qualified deferred compensation plan, or income received from sources other than your Employer.

52.   As the foregoing definition and term indicates, "monthly earnings," which is the one place in the policy where the claimant's K-1s are invoked, relates to that income earned "just prior to [the claimant's] date of disability."

53.   This temporal aspect is consistent with the calculation into which it then feeds – the calculation of "indexed monthly earnings." According to the description of this term in the policy, "Indexing is only used to determine [the claimant's] percentage of lost earnings while [the claimant is] disabled and working."[1]

54.   As stated above, the impact of UnumProvident's misinterpretation goes beyond terminating the claim; it also operates (from UnumProvident's perspective) to decrease the period over which the benefit is owed.   This occurs through UnumProvident's present computation as to when Mr. Landis satisfied the Policy's 90-day waiting period.

55.   In an August 16, 2016 letter, Defendants erroneously calculate December 28, 2016, as being Mr. Landis's first day to be eligible

---

[1] Notably, this term is congruous with the policy's "active employment" provision. "Active employment" means the claimant is "working for [his or her] Employer for earnings that are paid regularly and that [the claimant is] performing the material and substantial duties of [his or her] regular occupation." One must be in "active employment" totaling at least 30 hours per week to qualify for eligibility for the policy's disability benefit.

to receive an LTD benefit under the AMS policy because AMS voluntarily continued to pay him a salary from October 5 through December 27, 2016, even though he had not been working during that time.

56.    UnumProvident then compounds that error in its letter of January 2, 2017, where it moved that date even further up the calendar to thrust Mr. Landis into "overpayment" status – to the point of turning Mr. Landis over to a debt collector who has since aggressively pursued this debt as UnumProvident's vendor. Specifically, UnumProvident now considers that date to be March 1, 2016, again attributing "disability income" to Mr. Landis even though the policy requires any such income to be the result of actual work.

57.    Under the Policy, Mr. Landis did not receive "disability income" for these purposes either, again because it was not income tied to him having been working. Instead, amounts he received during this period were due to salary continuation.[2]

---

[2] Courts have routinely recognized situations where, as here, the continued receipt of income from an employer where the claimant has ceased working is gratuitous compensation. *Lee v. Paul Revere Life Ins., Co.*, 2004 U.S. Dist. LEXIS 13616 *3; *McVeigh v. UnumProvident* 300 F.Supp.2d 731; *Harker v. Paul Revere Life Ins. Co.*, 28 Wis. 2d 537, 546, 137 N.W.2d 395 (1965)(noting "the employer may allow him to continue at such employment and draw his salary or wages under circumstances where the compensation is largely a gratuity."); <u>Matthews v. Sun Life Assurance</u>, 2007 U.S. Dist. LEXIS, *at 25-27 *Matthews* at 25-26. In *Matthews* the court explained that if the claimant were paid both while he was out of work and after he came back to work, it showed the compensation had nothing to do with work and should not be a factor in denying disability benefits. *Id.* at 26-27. Gratuitous compensation is poor evidence that the claimant is not disabled. *Id.*

58.     But setting that distinction aside, the real error in this part of Unum's handling of Mr. Landis's claim lies more in the company's application of the "waiting period," which the policy defines as follows:

> WAITING PERIOD means the continuous period of time (shown in each plan) that you must be in active employment in an eligible group before you are eligible for coverage under a plan

59.     "Active employment" does not involve "earnings" alone, but "earnings" *coupled with* the Mr. Landis's performance of "the material and substantial duties" of his occupation.  These two things are linked by the conjunction "and" which on its face requires both conditions to be met, which has not occurred in this case.

60.     Notwithstanding the reasons above, Mr. Landis's appeal was rejected in a letter dated July 14, 2017.

61.     Documents provided since the denial establish numerous breaches and errors committed by UnumProvident while administering Plaintiff's claim, including:

   (a)   The targeting of Plaintiff's claim for denial because ERISA governs;

   (b)   The failure by UnumProvident to take any meaningful measures to insulate its claims process from its inherent conflict under the Supreme Court case *Glenn v. MetLife*

and instead allowing its profit motive to influence its claims administration for Plaintiff;

(c)   The withholding of relevant documents and information from Plaintiff throughout the claims process and depriving Plaintiff of the ability to obtain a full and fair review of his claim;

(d)   Taking an adversarial posture against Plaintiff instead of a fiduciary posture by searching for ways to avoid paying part or all his claim; and

(e)   Failing to adhere to the clear terms of the Plan.

62.   As set forth above regarding UnumProvident's fiduciary breaches, UnumProvident's claim decision was the product of a conflict of interest whereby it allowed its own financial interests to supersede its fiduciary obligations to Plaintiff.

63.   Employees who were responsible for the administration of Plaintiff's claim for benefits are eligible to receive bonuses and awards based at least in part on company profitability.

64. Further, employees who had supervisory involvement and authority over Plaintiff's claims process participate in Unum Group Corporation's management incentive compensation program.

65. Employees involved in the administration of Plaintiff's claim also participate in Unum Group Corporation's performance recognition program.

66. To receive bonuses or awards under either the management incentive program or the performance recognition program, Unum Group employees must meet certain criteria.

67. Satisfaction of the eligibility criteria for these programs is impacted at least in part by the denial and/or closure of claims like Plaintiff's.

68. Unum's history of abusive claims practices reaches back for many years and includes documented policies of instructing, encouraging or incentivizing employees responsible for claims administration to deny claims, especially when that claim is found likely to be subject to ERISA.

69. This strategy finds its inception in what has become known as the LeBeouf Report.

70.   The LeBeouf Report and internal documents relating to established a strategic approach that included an "ERISA Task Force" created by UnumProvident for the implementation of standardized claims practices that encouraged employees to consider the applicability of ERISA during the administrative process and then to target such claims for potential denial to "take advantage of ERISA protection."

71.   In an October 2, 1995 memorandum, UnumProvident management-level employee Jeff McCall assessed the opportunities afforded by ERISA's application to aggressive handling of claims as follows:

> The advantages of ERISA coverage in litigious situations are enormous; state law is preempted by federal law, there are no jury trials, there are no compensatory or punitive damages, relief is usually limited to the amount of the benefit in question, and claims administrators may receive a deferential standard of review.  The economic impact on Provident from having policies covered by ERISA could be significant.  As an example, Glenn Felton identified 12 claim situations where we settled for $7.8 million in the aggregate.  If these 12 cases had been covered by ERISA, our liability would have been between zero and $0.5 million.

> The key for determining the applicability of ERISA is whether or not the employer "sponsors" or "endorses" the plan.  If the employer pays the premium, the policy would usually, but not always, be considered to be governed by ERISA.  Salary allotment or payroll deduction arrangements, by themselves, do not necessarily mean that a policy is subject to ERISA.

> While our objective is to pay all valid claims and deny invalid claims, there are gray areas, and ERISA applicability may influence our course of action.

Memorandum of Jeff McCall (a copy of the foregoing memorandum is included in Plaintiff's ERISA administrative record).

72.    Between 2002 and 2004, Unum was subjected to investigation by several state departments of insurance.  The announced purpose of that investigation was "to determine if the disability income claims handling practices of [UnumProvident] reflected systemic 'unfair claim settlement practices'" in violation of various state insurance laws.

73.    Upon completion of the investigation, examiners found many abuses, including unfair construction of evidence and evidentiary or contractual requirements for proving entitlement to benefits.  (A copy of the foregoing document is included in Plaintiff's ERISA administrative record).

74.    After completion of this multi-state investigation in November 2004, Unum entered into a Regulatory Settlement Agreement ("RSA") whose terms required it to pay a substantial fine and to amend its claims practices.

75.   UnumProvident, however, did not faithfully comply with the terms of the agreement, and instead engaged in an effort to better camouflage its pre-RSA claims practices.

76.   Not long after its execution of the RSA, UnumProvident instructed its employees to continue to decide claims as they had done previously, notwithstanding UnumProvident's forthcoming revision of its claims procedures to satisfy any future inspectors.

77.   As part of this resumption of its pre-RSA activities, UnumProvident continued its incentivization programs aimed at closing claims and obtaining "recoveries" for UnumProvident in the form of released reserves.

78.   UnumProvident employees at the claim administration level continued to take part in a company bonus system and award program tied to company profitability.

79.   UnumProvident employees at the claims level also continued to be evaluated on a regular basis for their efforts to achieve goals connected to the enhancement of corporate profits.

80.   As set forth above, to receive bonuses or awards under either the management incentive program or the performance recognition program, Unum Group employees must meet certain criteria.

81.   Satisfaction of the eligibility criteria for these programs is impacted at least in part by the denial and/or closure of claims like Plaintiff's.

82.   UnumProvident's "Manager Toolkit" shows metrics included within these criteria involve claim closure or termination numbers, liability acceptance rates, and claim reopen rates.

83.   These values, individually or in the aggregate, may influence the award of performance compensation or consideration of corporate advancement opportunities.

84.   UnumProvident even explicitly directs its management employees to filter information to those reporting to them so their interests likewise justify with those of the overall company.

85.   As UnumProvident's documents make clear, the more an individual or unit is perceived as contributing to the meeting of UnumProvident's financial goals, the greater their share of the bonus pool.

86.   UnumProvident also actively tracks the pursuit of goals for closing claims or recovering or conserving reserves on a regular basis and consistent basis through Weekly Tracking Sheets.

87.   According to Unum's claims procedures pertaining to IDI milestone reviews, these goal documents are made available to the claim directors, the very individuals charged with deciding whether claims will be approved or denied and whether open claims will be terminated.

88.   UnumProvident also uses a "balanced business scorecard" approach at the director level to ensure claims personnel remain informed throughout the year on whether the company is meeting the financial goals necessary for the availability of bonus or incentive compensation.

89.   These scorecards are among those documents evidencing the continuation of Unum's earlier pre-RSA claims practices; other Unum documents have also specifically referenced goals, expectations, projections and targets for closures.

90.   This active conflict of interest under which UnumProvident employees operate further calls into question the credibility of

UnumProvident's claims personnel and reviewers, such that no deference to the decision made here should be accorded.

91.    UnumProvident considered the applicability of ERISA before making its decision.  This presents an additional reason for application of a *de novo* standard to their claim decision, and to excuse the Plaintiff from further utilization of UnumProvident's claim process.

92.    UnumProvident did not provide Plaintiff with a meaningful opportunity for a full and fair review of his claim for benefits as required by 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-

93.    UnumProvident's decision process has not comported with 29 U.S.C. § 1133's requirement that any notice of the denial must contain the specific reasons for such denial, written in a manner calculated to be understood by the participant, and must comport with Department of Labor regulations.

94.    Plaintiff has exhausted all Plan remedies even though UnumProvident's failure to adhere to Plan terms or ERISA requirements and regulations did not require it.  As such, this case is ripe for judicial review.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Raymond J. Landis respectfully requests this court find jurisdiction and venue appropriate, and after trial, grant the following relief:

a.    Award Plaintiff past benefits due and payable under the terms of the employee welfare benefit plan/insurance policy(ies) and/or pension plan pursuant to 29 U.S.C. § 1132(a);

b.    Enter a declaratory judgment as to Plaintiff's entitlement to future benefits and an appropriate order directing the Defendant to pay all similar claims of Plaintiff in the future pursuant to 29 U.S.C. § 1132(a);

c.    Should the Defendants voluntarily pay all past due benefits, enter a declaratory judgment as to Plaintiff's entitlement to future benefits, along with entering an appropriate order directing the Defendants to pay similar claims to Plaintiff in the future, or in the alternative, for the Court to remove Defendants from their fiduciary roles in the administration of The Plan(s), and to appoint a special master at Defendants' expense to substitute for this entities with the special master

having the authority to make all determinations as to Plaintiff's entitlement to future benefits;

d.    For a judgment against the Defendants awarding Plaintiff prejudgment interest, costs and expenses, including the reasonable attorney's fee as permitted under 29 U.S.C. § 1132(g)(1);

e.    For an order enjoining the Defendants from further breaches of fiduciary or co-fiduciary duties, and direct that Defendants exercise reasonable care, skill, prudence, and diligence in the administration of Plaintiff's claim;

f.    For an order pursuant to 29 U.S.C. § 1132(c) awarding Plaintiff $110 for each day beyond the Defendants' due-date for responding to Plaintiff's ERISA production request;

g.    For an order requiring Defendants to provide Plaintiff with any additional benefits to which the Plaintiff would be entitled pursuant to a finding that the Plaintiff is disabled under The Plan(s), including waiver of premium benefits under other policies/Plans that Defendants have has administered; and

h.      Such other relief as may be deemed just and proper.

Respectfully submitted,

M. Clayborn Williams
(ASB-9101-A43M)

**The Martin Law Group, LLC**
**Attorneys for Plaintiff**
P.O. Box 20087
Tuscaloosa, AL 35402-0087
Phone (205) 343-1771
Facsimile (205) 343-1781
clay@erisacase.com

**Plaintiff's Address:**

Raymond G. Landis
c/o The Martin Law Group, LLC
P.O. Box 20087
Tuscaloosa, AL 35402

**Defendants' Address:**

c/o CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104